We'll hear argument first this morning in Case 11-1025, Clapper v. Amnesty International. General Verrilli. Mr. Chief Justice, and may it please the Court, the question in this case is whether respondents have standing to bring a facial challenge to the 2008 amendments to the Foreign Intelligence Surveillance Act. Those amendments provide authority to the executive to conduct surveillance targeted at foreign persons located abroad for foreign intelligence purposes. Along with that grant of authority, Congress imposed statutory protections designed— General, is there anybody who has standing? As I read your brief, standing would only arise at the moment the government decided to use the information against someone in a pending case. Several— But to me that would seem to say that the act, if there were a violation, I'm not suggesting there is, but that if there was a constitutional violation in the interception, that no one could ever stop it until they were charged with a crime, essentially. Your Honor, under the statute, there are two clear examples of situations in which individuals would have standing. The first is if an aggrieved person, someone who is a party to a communication, gets notice that the government intends to introduce information in a proceeding against them. They have standing. That standing could include a facial challenge like the one here. General Verrilli, can you be specific on who that person would be? Because as I understand it, it's unlikely that, for example, the lawyers in this case would be charged with any criminal offense. It is more probable that their clients would be, but according to the government, their clients have no Fourth Amendment rights because they are people who are noncitizens who acted abroad. So it's hard for me to envision. I see the theoretical possibility, but I don't see a real person who would be subject to a criminal charge who could raise an objection. Well, if the information were or if anyone gets notice, including the client, then the lawyer would know and the lawyer would be in a position at that point to act. But the client is somebody who is abroad and who acted abroad and is not a U.S. citizen. That's certainly true. But in addition, Your Honor, the statute provides that electronic communications service providers can challenge authorizations under the Act, so you certainly would be standing in that instance. There was such a case. How likely is it that a service provider would object? Well, the service provider did object to the immediate statutory predecessor to the 2008 amendments, and the FISA court litigated that constitutional challenge. So there is a concrete context there in which it arises, but even beyond that. The litigation was unsuccessful. Well, that's right. The Court found there was no Fourth Amendment violation there. But I think the point here, Your Honor, the key point is this, that the — in a normal case, a plaintiff would challenge the application of the authority to that plaintiff. In a situation like this one, we acknowledge that it may be difficult for a plaintiff to do so because a challenge to the application gets into classified information pretty quickly. I think what the Respondents have tried to do here is to find a theory of the case that avoids that difficulty. Well, you just — what you just mentioned, suppose — does not suppose that the court should hold there is standing. Couldn't the government then say as far as the merits of the complaint, this information is classified, these are State secrets? We can't go forward with the litigation. That is a possibility. Of course, there is a procedure that the executive branch would have to go through, but that's a possibility. But I don't think we can get to that point, Your Honor, because I do think the key point here is that the Respondents' claims about this statute depend on a cascade of speculation. This statute only grants authority. It doesn't command anything. And in order for the Respondents to make a claim that they are injured, in fact, by this statute. Sotomayor, I don't know that you've answered my question, or perhaps you have, but I just want to make sure that I'm clear. Given that lawyers are unlikely to be the targets of an investigation, if they — if their conversations were to be intercepted, according to you, they'd never have standing. I don't think it's appropriate, Your Honor, to relax the Article III standing requirement of injury in fact, based on the reality that the specific applications of this statute may involve classified information. Scalia, we've had cases in the past where it is clear that nobody would have standing to challenge what is brought before this Court. That's exactly right, Your Honor. And we've said that that just proves that under our system of separated powers, it is none of our business. But the Court's authority cannot be invoked in that circumstance, and the mere fact that a specific application requires getting into classified matters can't change that basic Article III requirement. Kennedy, is it the test that you propose that the injury — I think your brief used the word imminent. Is another way of saying that, is it unfair to characterize the government's position as saying that you're submitting that the injury must be certain? The key point, I think, is narrower than that, Justice Kennedy. This is a case in which the speculation is about the government's conduct, not the connection between the government action and an ultimate effect. Kennedy, let's assume for the moment that the lawyer would be — that the lawyer would be injured if his communication with the client were intercepted, or at least that he would have standing to prove injury. Let's assume that for the moment. If that is an acceptable premise, assume that it is, are you saying that it has to be certain to occur, and then another test is there's a reasonable likelihood, or then we get in the middle and it's a substantial likelihood? You have to say — you say imminent. The government conduct being challenged has to either have occurred or be certainly impending. And here we have the polar opposite, Your Honor. I think it is important to think about it. Certainly impending. Certainly impending. That's the language from this Court's opinions. And I think — and I think if the Court thinks about every single case in which the Court has found standing, there's never been a dispute about whether the government was going to act or not. The dispute was only about the connection between the government action and the plaintiff's  Here, the fighting about what the plaintiff's injury has to do with the plaintiff's injury. Ginsburg, in this case, the complainant can never know. I know you emphasize the speculative nature of this claim, but it's not speculative that the government being given this authority by Congress is going to use it. Isn't that so? I mean, are we to assume that the — Yes. That's not speculative, Justice Ginsburg. But what is speculative is the connection between the grant of authority and a claim of injury. I do think it's important to think about it. Kennedy, as you were talking, you wanted to say there's a cascade of inferences, I think was your phrase. Do you want to tell us that, in your view, these — all these inferences that we're required to go through, if the Respondent's Theory is adopted, you were going to tell us that? I'd like very much to do that. Thank you, Your Honor. Yes. First, the Respondents have to speculate about what the intelligence priorities and objectives of the executive branch are. Second, they have to speculate about how the executive branch officials are going to exercise their judgment to translate those priorities into procedures and procedures that comply with the statutory targeting and minimization requirements. Third, they have to speculate about the independent judgment of an Article III court assessing the lawfulness of those procedures and assessing whether those procedures comply with the Fourth Amendment. Is there much speculation involved in how the — I think it's only one time, and it was under the preamended statute, that the FISA court ever turned down an application? Yes. But that, Your Honor, is, I think, not a fair assessment of the process. It's really very much an iterative process in which there's a dialogue between the executive branch and the FISA court in which the court can demand more information, raise objections, those get worked out, and then there's a final order. So I don't think it's fair to infer from the fact that there's only one rejection that this — that it's a process that isn't rigorous. But in addition to the speculation I just described, once you get through all that, you still have to speculate about whether the communication that — whether the persons with whom the Respondents are communicating are going to be targeted, and that Respondents' communications will get picked. Breyer, here is, I assume, that it is an injury for an American speaking in America to have his communication intercepted against his will by the American government. We take that as a harm, is that right? It may be a harm, yes. Okay. So the question is, how likely is that to occur? No, I think the question under this Court's cases, Your Honor, is whether the government is going to take an action that makes that certainly impending. Oh, I find. That's what I say. Certainly, it might not be a storm tomorrow. I mean, you know, nothing is certain. But I think it's some degree of what you say, some people say certainly, some say a reasonable likelihood, et cetera. So put that to the side. What I want to know is, we have the declaration of Mr. Scott McKay. Now, Mr. Scott McKay says he's represented two of the people who are allegedly part of al-Qaeda and committed crimes, and he's represented them for some time. One was in Guantanamo. Another is charged with various crimes and is subject to many, many civil suits. In the course of that, he has to phone and has phoned lots of people in Saudi Arabia, in the various Arab states, and in the past the U.S. intercepted some 10,000 telephone calls and 20,000 e-mail communications involving his client. So isn't it a fair inference, almost pretty certain, maybe about as much as the storm, that if the security agencies are doing their job, they will, in fact, intercept further communications involving this particular individual, the two that he's represented? Actually, Your Honor, I think that gets to the last speculative interpretation that needs to be drawn in order for them to make the out-there chain of causation, and it's this. They have to speculate that whatever surveillance occurs will occur under this authority as opposed to other forms of lawful authority that they do not challenge. And Mr. McKay, that situation is a very good example of this. We point out in footnote 11 at page 32 of our brief that Mr. McKay says, yes, my client was subjected to 10,000 interceptions of phone calls, 20,000 interceptions of e-mails. Every one of those, it's a matter of public record, was under the authority of FISA before it was handed to the House of Ministers. Breyer, why can't we get an answer to that question? I mean, I see your point. I'm interrupting you because I see where you're going, and it seems to me that, at least if held in camera, I can't imagine what security it would violate whether the government were to say, if necessary privately to a judge, would say, no, we do not intend to use this new authority for this purpose. Or it could say the contrary. And so couldn't we find out whether he has standing there without jeopardizing any concern of national security? I think you can't get there without establishing that there's a case of controversy and they haven't. Well, there is if, in fact, the government is going to use this statute to continue  This case is at summary judgment now, and the Respondents moved for summary judgment based on the declarations that they submitted. And the declarations that they submitted contained the information I described. And so the only information that's in front of the Court in making the decision now is information that that surveillance occurred under another authority that still exists and could still be applied. I don't see how that is pertinent. What you're saying is they don't have standing to challenge Program A because they may also be injured under Program B. And do you have an example of a case where we've held that? I think the problem, Mr. Chief Justice, is redressability, in that the argument of the lawyers is that we have a duty to incur costs to avoid the surveillance. But that duty is triggered by, according to their expert affidavit, by any Well, there again, it depends how you phrase their injury.  statutory provision that they think is facially invalid, saying that, well, you're not going to get any relief because you're going to be subject to surveillance under a different provision. I mean, they may say, well, we may or we may not, but we still have the right to cure the injury of being subject to surveillance under 1881a. But they still have to show a concrete application of the authority they're challenging. That's what this whole case is holding. Do we parse injury that finely? I mean, the injury, it seems to me, is being overheard. Does it by the government? Do we say, oh, well, it's one injury to be overheard under this statute, it's another injury to be overheard under another statute? Do you know any case where we've cut the baloney that fine? I don't, but I do think the redressability point is a valid one. The thing is, they're going to be injured by being overheard, and you're saying that they will be overheard anyway, and therefore, by preventing the government from overhearing them under this statute, we're not redressing their grievance, which is being overheard by the government. That's precisely what I'm saying. And so if the question from these lawyers' perspective is, what chance do I have of being overheard and what precautions do I have to take, this statute makes them think about that question in an entirely different way, doesn't it? Well, I think as compared to, and make two points about that, first, in terms of the expansion of authority, yes, that's fair with respect to the authority that existed immediately preceding the statute. I actually think, a bit of context is relevant here, that what this statute was trying to do is reset the initial balance that Congress struck under FISA in 1978, when the large majority of overseas communications were carried by satellite and therefore not within FISA. And of course, what the other thing is talking about is the fact that it's not the same thing. Kagan Yes, but if you take the baseline position before this statute and the position after this statute, these lawyers and other people in their situation are going to understand this is just true, that the government is intercepting more material, and that they have to take greater precautions in order to keep their conversations confidential, if that's what they want to do, which lawyers want to do. So they're going to take precautions that they wouldn't have had to take the day before this statute was passed, it seems to me, just from a kind of commonsensical point of view. Verrilli, I don't agree with that, Justice Kagan. I think this statute does not regulate them. It confers authority on the government. They take whatever precautions they choose to take based on their beliefs about how that authority is going to be exercised. That depends on the speculation I described. What this Court held in Summers is that you have to have a concrete application of the authority in order to meet the minimum constitutional requirement for Article III. Sotomayor Now we're back at the same circle we started with, which is the one that Justice Breyer started with. He pointed to one person under who has been surveilled continuously, tens of thousands of interceptions. Can you really say that the government's not going to target him under this greater authority, that it sought just for the purpose of ensuring that it casts a broader net? Verrilli, I think it is speculation. I think you do not have a concrete application of this authority against anyone, and therefore you cannot meet the basic Article III requirement of standing that's set forth in Summers. Kagan I guess I don't see why, General Verrilli, this case is any different from Monsanto. In Monsanto, the government deregulates genetically modified alfalfa, says go plant it. Now, there were these farmers who were complaining, and they said, we don't know if that will contaminate our crops or not. We think that there's a significant risk that it will contaminate our crops. Because we think that there's that significant risk, we have to take precautions. Now, why isn't that exactly what's happening in this case? We now think, says, say, the lawyers, that there's a significant risk that our conversations will be surveilled, a risk that didn't exist before. Because of that significant risk, we have to take precautions of the exact same kind that the farmers in Monsanto took. Therefore, there is standing. Verrilli, I think the difference between this case and Monsanto illustrates our point. If the plaintiff in Monsanto had come into court and said, Congress has enacted a statute that gives the government agency the authority to deregulate genetically modified seeds, we think there's an objectively reasonable likelihood that the government is going to exercise that authority to deregulate alfalfa. Kagan. Well, I don't see that difference at all, General Verrilli, because in fact what Monsanto did, it's not Congress, it's an agency. But an agency issued a rule saying that farmers could go plant genetically modified crops. And then there was the question whether, because of that essentially delegation of authority, the plaintiffs in that case were going to be burdened. And the plaintiffs said, you know, we might be harmed and we have to take precautions in order not to be harmed. So it's the same thing. It's a different actor. But it's a delegation of authority and a fear that that delegation of authority will result in harm, leading to a set of precautions. Verrilli, There's at least two differences, Justice Kagan, with all due respect. First, there is an exercise of the delegation of authority in Monsanto that is not present here. Here there is speculation about how the authority will be exercised. Second, with respect to the authority, the record in Monsanto showed the seeds were planted in the ground, and the only question was a question of scientific assessment about the likelihood that the plaintiff farmer's crops were going to be affected. And that was a scientific judgment based on the pollination radius of the bumblebee, whether it would affect their crops. But what we're talking about here is speculation about how government officials  Kagan. And the lawyer says, I'm representing a person associated with a terrorist organization. I'm representing KLM in the case of one of these lawyers. And I'm going to be talking to that person's family members and associates and trying to find out everything that I can. Now, as a lawyer, would you take precautions or would you pick up the phone and start writing emails to all those people? If I took precautions, it would be because of a belief that I had to comply with an ethics rule, and the ethics rule would be the cause of me taking those precautions. I don't even think it has to do with an ethics rule. If you're a good lawyer, forget the ethics rule and how the ethics rule applies. Are you really going to tell me that you, as a lawyer, would just pick up the phone in the face of this statute and talk to these terrorists' associates? Your Honor, it seems to me that that hypothetical is a variant of exactly the argument that the Court rejected in Summers. There isn't a concrete application. In Summers, the Court said even in a situation where it would be likely that some members of the Sierra Club would be affected by the exercise of authority that the statute conferred, that you cannot have a case of controversy absent the exercise of the authority. The Court said, well, we don't know that this person is just going to stumble upon a piece of land that's affected by this government action. I asked you a different question. You're a lawyer representing a terrorist and talking to the terrorist's affiliates. And the question is, is this statute going to make you not use the email in the way that you ordinarily would use the email? Well, given the availability of traditional FISA surveillance, surveillance under Executive Order 12333, surveillance by foreign governments, I don't think it depends on this statute, but in any event, whatever the reasonable judgment of a lawyer in those circumstances, there isn't a concrete application of the statute that creates a case of controversy here. And you'll never know. There may be dozens of concrete applications affecting the plaintiffs in this case, but we will never know. Well, I do think the problem here, Justice Ginsburg, really is, the heart of the matter here really is that in a normal lawsuit, a plaintiff would challenge the application of the statute, of the authority conferred under the statute. Here, that would run into classified information. So the Respondents have tried to plead a theory that allows them to avoid that problem, but it is inherently based on speculation.  that you ordinarily would use the email. Breyer. Well, this is speculation. The government has a statute that says you can wiretap in the United States organized crime when life is at stake and you show it to a judge. Then they say that isn't good enough. We pass a new statute and it says suppression of organized crime, wiretap when you want, without a judge. Now, a lawyer who represents organized crime says my clients have been wiretapped under the first statute 400,000 times. Now, I'll tell you, when the government gets a hold of this second statute, it's going to be a million times because they want to suppress organized crime. I'm not saying my clients are guilty, but we all know. Okay. So now, the question, which I haven't thought of before, you're saying no standing. No standing. You can't raise it. In a case like that, the lawyer, the normal course would be for the lawyer to challenge the application of the statute. Here, you have the classified information problem, but I will say that it is. Breyer. Well, you can't do that here. So what I'm thinking is he seems to be separate from other people. He seems very likely to have a concrete injury. If they aren't wiretapping the people who are described here, who are they wiretapping? And they pass this statute in order to have extra authority. So put those three things together and they seem to spell mother, perhaps. I mean, you know, what? No, they don't. And the other thing I think that's critical here is that I think Congress was sensitive to the probability that you could not have facial challenges of the kind that Respondents want to bring. And so there's an entire alternative. Kennedy. You're saying that the government has obtained this extraordinarily wide-reaching power, and we have extraordinary risks that face this country, and the government's not going to use it. That's just — it's hard for me to think that the government isn't using all of the power at its command under the law in order to protect this country. And you want to say, oh, well, don't worry, it's not happening, there's another statute. That's the problem I have with this line of argument. I'm not saying that at all, Justice Kennedy. But it remains the case that the way that in order for there to be an Article III case or controversy, a concrete application of that authority has to be demonstrated, and it hasn't been on the jury of the plaintiffs. Well, it's the Justice Kagan's hypothetical. The lawyer — and I don't forget about the — I think the ethics problem is a very substantial one. I think the lawyer would engage in malpractice if he talked on the telephone with some of these clients given this statute. And I think it would be the ethics rule that caused the lawyer to take those steps, not the statute. You'd still have the same interests. But it's still the reality. He still has to change his conduct. I'd like to make one more point, if I could, Justice Kennedy, that I think goes to this and then I'd like to reserve the balance of my time. Congress was aware of the difficulty that — of bringing facial challenges. And so Congress put into place an alternative structure of accountability here. There are — this is not unbounded authority. There are targeting requirements, minimization requirements, certification by the highest level — highest levels of the executive, and there is independent review by an Article III judge to ensure compliance not only with the statute, but also with the Fourth Amendment. And there is ample congressional oversight. So it's not the case that this is a free-ranging authority at all. Thank you. Roberts. Thank you, General. Mr. Jaffer. Mr. Chief Justice, and may it please the Court. Plaintiffs have standing here because there's a substantial risk that their communications will be acquired under the Act, and because this substantial risk has effectively compelled them to take immediate measures to protect information that is sensitive or privileged. Plaintiffs are lawyers, journalists, and human rights researchers who routinely engage in communications that the Act is designed to allow the government to acquire. Plaintiffs communicate, for example, foreign intelligence information, the kind of information that the statute expressly authorizes the government to collect, to retain, and disseminate. Our cases, of course, say do say certainly impending, not substantial risk. Well, Your Honor, I think that there is a question, even in cases that involve only a future injury, whether certainly impending is, in fact, the standard. But leaving that to the side, this is not a case that involves only an allegation of future injury. Let's leave that aside. You have two arguments.  I want to focus on the former. Our standard is certainly impending, and you articulated it by saying substantial risk. There's obviously a vast difference between those two. Well, I don't think, Your Honor, that the Court has settled on certainly impending. The cases that the government cites are cases like — I think that the one that the government cites, relies on most heavily is Summers. But in Summers, the distinction between likelihood and certainly impending was not one that the Court relied on in that decision. The Court said that plaintiffs couldn't meet even the lower standard. So I think that the discussion of certainly impending— But both in Summers and Monsanto, the government tells us we knew that the governmental act was occurring. And then, once we knew that, the question was substantial risk. Justice Kennedy, the cases that we rely on, Monsanto, Laidlaw, Mies v. Keene, these are cases in which the Court didn't look to the certainly impending standard at all. The question that the Court asked in those cases was, is there a substantial risk? Is there a substantial risk that effectively compels the plaintiff to act in the way that they're acting? You're right that the government points out this distinction in Monsanto. They say Monsanto is a case in which the government was actually doing something, was known to be doing something. But even in this case, first of all, we know that the government is using the statute. They've acknowledged that they're using the statute. So there is a certainty of government conduct. But aside from that, those cases like Monsanto and Laidlaw and Mies are not cases that actually turned on the fact that the government was doing something. They're cases that turned on the fact that there was a substantial risk of future injury, and the substantial risk compelled plaintiffs to do something immediately. Roberts. It's not enough, of course, to know that the government is using the statute. The whole question is whether or not your clients have been injured, not whether the statute is being used. I agree with that. I don't think it would be enough for a plaintiff to walk into court and say the government is using the statute and therefore we have standing. But our plaintiffs are not in that position. Our plaintiffs' Counsel, I have an issue. I'm sorry. Do you want to finish? If it's all right, could you finish the answer? Sure. I was just going to say that our plaintiffs have reasons to believe that their own communications will be monitored under the statute. One relates to the kind of information that they routinely exchange over the phone and by e-mail, foreign intelligence information. But it's also that plaintiffs communicate with the kinds of people the government is likely to monitor under the statute. Scalia. Does that assessment take into account the fact that a court is going to pass upon the government's ability to intercept these communications? It does, Justice Scalia. I mean, you're right that there is a court that in some sense stands between plaintiffs and the future injury that they fear. With the obligation to apply the Fourth Amendment. I don't think it's that simple. The court, the FISA court, is tasked with assessing the reasonableness of targeting and minimization procedures. But the statute itself forecloses the court from imposing the kinds of limits that plaintiffs think the Fourth Amendment requires. So, for example, the statute itself in section G4 says that the government is not required to identify the facilities to be monitored. And the statute itself in defining targeting procedures defines them to be procedures intended to ensure that the targets are outside the United States. But if, as you say, those procedures violate the Fourth Amendment, it doesn't matter what the statute says. Well, the court would have to If those statutory provisions would produce a violation of the Fourth Amendment, they're null and void, right? I think that's right. The court would have to strike that down. Okay. So the FISA court would presumably know that. Well, I think that if that had happened over the last 4 years, the government wouldn't be seeking reauthorization of the statute now. But even if it were to be reauthorized, the court would have to strike that down. Ginsburg. But, Mr. Jaffer, could you be clear on the expanded authority under the FAA? As I understood it, it's not like in the old statute where a target was identified and FISA decided whether there was the court decided whether there was probable cause. Under this new statute, the government doesn't say who the particular person or the particular location. So there isn't that check. There isn't that check. That's absolutely right, Justice Ginsburg. The whole point of the statute was to remove those checks, to remove the probable cause requirement and to remove the facility requirement, the requirement that the government identified to the court the facilities to be monitored. So those are gone. That's why we use the phrase dragnet surveillance. I know the government doesn't accept that label, but it concedes that the statute allows what it calls categorical surveillance, which — which is essentially the surveillance that plaintiffs here are concerned about. If we accept that, if we assume for the sake of argument that certainly impending is the general standard, if we accepted your other argument that the plaintiffs have standing because they took preventative measures, wouldn't that undermine completely the certainly impending standard? You have a person who is in a situation where there's a certain risk, a certain degree of risk of the person's conversation being intercepted, but it's not certainly impending. So then the person simply takes some preventative measures and acquires standing that wouldn't otherwise be present. I don't think it would undermine the future injury standard, Your Honor, for a couple different reasons. The first is that fairly traceable, which is the standard that the Court has used when there's an actual injury, is a standard that does real work. So if plaintiffs, for example, were acting unreasonably in taking the measures they're taking, if plaintiffs were gratuitously buying flight tickets, they couldn't create standing out of nothing. It would have to be a reasonable reaction to the risk. But the other thing is, and this is just to go back to sort of the basic standard. Scalia, but it doesn't have to be a reasonable reaction to a certainly impending risk, does it? You're right, Justice Scalia, it doesn't on our theory. But that's his question, doesn't it undermine the certainly impending? And the only point I was trying to make is that if there's a distance between these two standards, it's a pretty narrow distance. But the other point I want to make is just that the reason, to the extent the Court has imposed a higher standard for cases involving only future injury, and again, we don't concede that the Court has imposed a higher standard, but to the extent it has, it has done so because it wants to assure itself that the future injury is sufficiently concrete to warrant the Court's intervention. But if there's an actual injury, the Court is assured of concreteness. The actualness of the injury makes the case concrete on its own. And so I think that the standards do different work. I don't think it's a question of an end run around the imminent standard, it's a question of the Court assuring itself that there is a concrete case before it. Sotomayor, it seems to me that the Government's strongest argument goes something like this. I don't think that they would say it in these words, but you have some clients where it actually does seem completely reasonable that they would take precautions, that they would not get on the phone and they would not use e-mail in the way that any old person would. But just those clients, these lawyers of terrorists, essentially shouldn't be using that e-mail or getting on the phone anyway, even before the FAA was passed. They would have been wise and indeed maybe ethically required to use precautions. So what does the FAA do? I guess this is a point about redressability, it's a point about causation, but that seems to me the strongest of the Government's arguments. Well, Justice Kagan, this is something that the declarations address specifically, the distinction between the burden imposed by FISA, traditional FISA, and the burden imposed by the new statute. And it's true that under the old statute, plaintiffs were required to take precautions with respect to a subset of their communications, and they acknowledge that in their declarations. But the new statute reaches whole categories of people who couldn't have been reached under FISA. FISA had a probable cause requirement. It had to be a foreign agent on one end of the phone. And so when one of the lawyers in this case was talking to somebody who they thought the Government might believe to be a foreign agent, they took those precautions even before. But now they have to take those precautions, some of which are very costly. They have to take those precautions with respect to people who are, for example, witnesses overseas or journalists overseas or human rights researchers overseas, as Scott McKay says in his declaration. With respect to every single international communication, I have to make an assessment of the risk that the Government's. Kagan, do you have specifics in the affidavits of things that your clients would have done previously that they cannot do now? Yes, Your Honor. So, for example, well, I'm not sure that this goes directly to your question, but in the McKay affidavit as well as in the Sylvia Royce affidavit, Sylvia Royce is another one of the attorney-plaintiffs in this case. Both of those plaintiffs discuss the additional burden of the FAA. They talk about measures that they are taking because of the FAA specifically, and they mention the kinds of communications they're having with people who could not reasonably be thought to be foreign agents. What are the measures besides having to travel to have conversations? I think it's a spectrum, Justice Ginsburg. It begins with just being more circumspect on the telephone, and it goes to, for example, talking in generalities rather than specifics. Let me see if I can give you actual citations for these. So the plaintiffs have in some cases been deterred from communicating over e-mail or the phone. Chris Hedges discusses that at 366a of the appendix. Scott McKay discusses it at 371a. In some instances, the plaintiffs have talked in generalities rather than specifics. Sylvia Royce at 352a. In some instances, it has even required plaintiffs to travel overseas to gather information that they might otherwise. Ginsburg. Travel overseas, I understand, is the one thing that has a dollar amount attached to it. Right. But these others, these other precautions, being more circumspect in their questions, talking in generalities. There's no dollar cost, Justice Ginsburg, but there is a professional cost. And I don't think it's – it shouldn't be hard to understand that professional cost. If a lawyer is – Sotomayor, can we go back to being a little bit more specific on this? I think I got it. There's a class of people that they would have spoken to on the phone or e-mailed before because they didn't think they would be covered by other surveillance measures that were in effect before this happened? That's right, Justice Sotomayor. That's right. Can you talk about what kinds of people those are? Because if the targets are always terrorists, or if they were – Right. Under this statute, there's no requirement that the target be a terrorist or a foreign agent, right? So under this statute, every time, for example, Sylvia Royce has to make a phone call with somebody overseas about the representation of somebody that she's representing, she needs to make an assessment about the sensitivity of the information, about the ways that information might be used against her client. So, for example, if she's talking to a journalist in Afghanistan about the detention of one of her prisoners at Bagram Air Base, that's a conversation that could not plausibly have been picked up under FISA, but it's a conversation that could be picked up under the FAA. Could I go back to a – Counsel, it seems to me that the concern you're talking about is present in every area of practice. If you're representing someone who's being prosecuted, you don't send an e-mail saying, you know, the government hasn't yet asked where you threw the gun and we've got to be prepared to answer questions on that, because as you know, that's a real problem. I mean, you don't send messages like that through the e-mails or just talk casually over the phone, either. I think that's right, Mr. Chief Justice, that to some extent this exists in every area of practice. But this is a statute that is focused on gathering foreign intelligence information, and our clients include lawyers who represent defendants charged with foreign intelligence related crimes. And this statute, I think, for good reason, makes them especially concerned about the communications they're engaged in with people overseas who couldn't have been covered under FISA, but who are covered under this statute. If I could just address the question that Justice Breyer asked, where he used the analogy of a lawyer who's representing someone who is alleged to be an organized crime figure. Suppose you have a case where a lawyer says, I represent so-and-so, the government thinks this person is an organized crime kingpin, I know the government has a very extensive wiretapping program for people who fall into this category, I want to raise – I want to challenge the constitutionality of the statute under which some of this wiretapping occurs. Would that person have – would that lawyer have standing? I think so. I think so, Justice Alito. I mean, assuming that the lawyer could establish that there was a substantial risk that his communications would be monitored, and that the substantial risk had compelled him to take measures immediately, I think that lawyer would have standing. Whether he would have a claim is a different question, but I think he would have standing. Do you know of any case that holds that? Well, I think that – I don't think it's a novel proposition. I think that in every one of – for example, in a case like Skinner, which was a challenge to the rules that allowed for blood tests of railway employees who had been in an accident. So that was a facial challenge brought to the statute, and nobody questioned standing. The Federal wiretapping statute has been around for 40 years. Has there been a single case that falls into this category that you're talking about? No, but I think that that – that there's a good reason for that, which is under Title III, people who are monitored get notice. There's a notice provision, a general notice provision. And so it doesn't – you know, and people don't have to worry that this is going on. But there's a notice provision under this statute. Only for prosecutions, right? Only for prosecutions. And the government has made clear that it's not going to – that the main purpose of this statute is not to gather evidence for law enforcement. Breyer, which I think is difficult, because it makes this case somewhat unique, that what you're worried about most is the definition of foreign intelligence information, which defines it to include information with respect to a foreign power or foreign territory that relates to the conduct of foreign affairs. It's very general. And then the Attorney General can, if he decides there are exigent circumstances, wiretap for a year anyway, without going to any court, something that isn't true of the – of the ordinary wiretapping, you say, look, if there's any special group that's going to apply to, that is the group that they wiretapped 10,000 times when they didn't even have that authority. And the government is saying, no, maybe, maybe not. And there we have an argument. Is there a way of resolving it? That is, is it open to the government, if you prevail, and we say, you know, they have this extra broad authority, there's no way to check it through a court, it does cause harm, these are the most likely people to be harmed, and there is very good reason, whatever words we use there, to think it will be used for them, that the government – is there some way the government could say in camera even, no, we're not doing it. Here are our procedures. We're not going to show them to anybody but you, Judge. I mean, is there a way for the government to show that you're wrong and that we're wrong when we think you're right? Yes. If the government were to walk into court either today or after the remand that we're asking for, if the government were to walk into court, either in camera or not, and say that plaintiffs will never be monitored under this statute, I think the case would be over. Plaintiffs are here not because they have a general complaint about the statute, but because they're actually, they're injured by it and they're, they, they. Well, the plaintiffs aren't going to be monitored under the statute. Other people are, and your concern is collateral, that the plaintiffs' discussions might be picked up. But the plaintiffs are not going to be monitored as targets under the statute. Well, Mr. Chief Justice, I don't think that's exactly right. I know that the statute says that the government has to target people abroad. But in targeting people abroad, the government is collecting plaintiffs' communications. So, you know, this isn't a situation where, where plaintiffs are entirely. But that's what I'm saying. Under your circumstance, what you said is the government could come in and say we're not going to monitor these people. Under the statute, you could say that today. The question is whether or not your clients' conversations can be picked up in an incidental way. Right. I guess I'm disagreeing with the word incidental. It's the whole point of this statute was to allow the government to collect Americans' international communications. The executive officials threatened a presidential veto when it was proposed that Americans' communications should be segregated in some way. In the district court, the government was very upfront about this, that the statute's whole purpose was to regulate the surveillance of Americans' international communications. So there is a sense in which American — Americans' — the surveillance of Americans is incidental. Isn't that what you just suggested as a way of resolving this case rather bizarre? Someone who is — whom the government believes to be a top terrorist and a great threat to the country can stop the use of this surveillance by hiring an American lawyer and then having the American lawyer come into court and say, you know, challenge the constitutionality of this and the way to resolve the case would be for the government to go into court and say, well, we're not going to — we're not going to target this — this person whom we believe to be a great security threat? I didn't mean to suggest something like that, Justice Alito. You know, ultimately, the authority that the government has claimed under this statute is what requires the plaintiffs to take the measures that they're taking. And I suppose that if all the government were to do at this point is to say secretly to a judge, we're not actually going to use this against plaintiffs, plaintiffs would — would have to take the same measures they're taking right now, and they would be injured in exactly the same way. To that point, you're conceding the government's position that you — on redressability? No, not — not at all, Justice Sotomayor. They promised you they weren't going to intercept you under this statute, that you would still take the same measures? No, no. I wasn't talking about the — the other programs. I was just saying the plaintiff's injuries flow from the authority that they're — that they're claiming under the statute. And if the government were to have a secret — you know, there were some sort of secret government memo that said plaintiffs will not, in fact, be — be surveilled. Their communications won't be picked up. If plaintiffs don't know about that change to the government's authority, they're going to have to take the same measures that they're taking. So I'm on that branch of your argument, which makes me more nervous than the other branch. The other branch, they might say something like, we're supposed to minimize risks of — of catching in the surveillance Americans, and this is what we do. And they show that, and they say, we go to the FISA court, except in these very rare instances where there are emergencies, da, da, da. And I guess by that point, they might be able to reduce the risks to this kind of plaintiff, to where it's the same as virtually anybody else, or they might be showing it's constitutional. That's where I — that's why I asked the question. I'm not certain of where I'm going. So maybe it's helpful to think of the cases involving pre-enforcement challenges. So you think — think of a case like American Booksellers Association, which we cite on, I think, page 55 of our brief. It's a case in which there's uncertainty about how the government is going to implement the authority. Nobody knows whether this particular plaintiff is going to be prosecuted. And, in fact, in that case, nobody knew whether anybody would be prosecuted. But the authority was out there, and the fact that the authority was out there, the government hadn't — hadn't disclaimed it. Plaintiffs were required to take immediate measures to conform their behavior to the statute, and plaintiffs — some of the injury there related to the kind of self-censorship that the Court has always been especially concerned about in First Amendment cases. All of those things led the Court to find that plaintiffs had standing to bring a pre-enforcement challenge. And the kind of uncertainty that the government says is present here, uncertainty about how the government will actually implement the statute, is the same kind of uncertainty that is present in every single pre-enforcement challenge. Scalia. Mr. Jaffer, apart from the government's power that you point out to conduct some of this surveillance without approval by the FISA Court in an emergency situation for one year, leaving that aside, I don't — I don't see how the rest of your challenge or your challenge to the remainder of — of this statute can be characterized as a facial challenge, because it necessarily assumes that the FISA Court will mistakenly say that there has been no Fourth Amendment violation, doesn't it, for all the rest of the statute? I don't think so, Justice Scalia. Our concern is not — not that — that the FISA Court will make mistakes, although it well might. The concern — the main concern is that the reasonableness inquiry that the FISA Court engages in is a narrowly cabined one. The Court can't say this is unreasonable because you haven't identified the facilities. It can't say this is unreasonable because you haven't identified a specific parcel. Scalia, it can say it's unreasonable because you have unreasonably limited us. Don't you think the FISA Court is able to say what we're allowed to look into under this statute does not comport with the Fourth Amendment? We have to look into more. Right. I think it's within the realm of — of the conceivable, that the Court could essentially subvert the statute in that way or find it unconstitutional, but the government would not be present for reauthorization now, and plaintiffs have to act on the basis of the authority that is delineated in this Federal law. And — and plaintiffs see that there's a law that is designed to allow the government to mine Americans' international communications for foreign intelligence information. The plaintiffs are people who report on war zones or they investigate human rights abuses in places like Syria and Lebanon and — and the Yemen and the Sudan, places where the government is likely to use this power. And plaintiffs include people who represent defendants who have been charged in — in crimes. And so they — I'm sorry. In our view, they act entirely reasonably in — in taking the measures they're taking, and they are effectively compelled in the same way that the plaintiffs in Monsanto, in Laidlaw, in — in Misvah-Keene were effectively compelled to take the measures that they — that they were taking. Mr. Jaffer, you mentioned your journalist clients. Do you have any affidavits or anything else in the record to suggest that those journalists have simply not gotten information from third parties that they otherwise would have gotten? In other words, this would not be a question of what precautions they took and what precautions were reasonable, but if you assume that information is the lifeblood of journalism, that their sources and their information has dried up as a result of this statute? Yes, Justice Kagan. Naomi Klein's declaration at page 338A addresses that. I believe that Chris Hedges' declaration addresses it, too, although I don't have a page citation for you. It's certainly in the lawyers' affidavits that — that some third parties are less willing to share information, Sylvia Royce, 353A. So — so — so the declarations were filed early. It was a summary judgment motion. They were filed relatively early. So to some extent, they are making predictions about how third parties will — will react, but I think it's an entirely fair prediction to — to predict that third parties who believe that the communications are being surveilled will react in the way you just described. And although it's not in the record, we have — we have spoken to our journalist clients more recently, and they have told us that the predictions have actually been realized in some cases. Just to go — to — to address the — the Monsanto point once more, I mean, I — I think it's just important to recognize that the Court has never found the kinds of present injuries that we are pointing to here to be irrelevant to the analysis. In Monsanto, in Laidlaw, and Meese, in Camretta, the Court looked to — looked to the present injuries as well as to the likelihood of — of future harm. And we are not making an argument that we are — that we are not making an argument that we are entitled to a lower — lower standing — to lower standing requirements or less stringent requirements than the Court has applied in other cases. We just — Alito, in Monsanto, suppose the challenge had been brought by a soybean farmer who said, I raise soybeans, people around me raise soybeans, I'm afraid that they're going to start planting genetically modified soybeans, but they never — they haven't done it up to this point, but, you know, I think this might be something that they will do in the future, and if they do that, then I'm going to have to take precautions. I think that would be a much harder case than the one that they brought. I mean, in — in part because the — the plaintiff would presumably know when — when the soybeans had been — had been planted, and the plaintiff would then have an opportunity to come into court, and it would be hard to — to — to establish, I think, a substantial risk in those circumstances where the plaintiff couldn't point to any evidence that — that any action had been taken towards the implementation of this policy that he feared. But in our case, again, the government has conceded that the statute is being used. It's conceded, or it's acknowledged, that the statute has been used to — to collect Americans' communications. It's true that we don't know that our plaintiffs specifically have been monitored, and we will never know that. But that kind of uncertainty was present — was present in Monsanto. Roberts, maybe it's a difference in how we're using the word monitor. You do know that your plaintiffs have not been monitored. Been targeted. What you don't — well, others have been monitored abroad, right? You're not monitored in the sense that this is the person's e-mail and that's what we're going to collect information from, right? Well, what happens is that the government identifies some category of targets that are being monitored abroad in the course of collecting those targets' communications. They collect Americans' international communications. And when they're collecting Americans' international communications, they are monitoring those communications. The statute allows the government to acquire them, to retain them, to disseminate them. It — even if it's not foreign intelligence information, which, as — as Justice Breyer says, recognizes, is defined very broadly, the statute allows the government to disseminate that information just redacting the American's name. The statute also allows the government to — to retain evidence of criminal activity. And for criminal defense lawyers, that's — that's a — it's a real issue. So you're right that — that our communications are not being targeted, but they are being monitored. I see my time has expired. Roberts. Thank you, counsel. General Verrilli, you have four minutes remaining. Thank you, Mr. Chief Justice. Two specific points and then three broader points. First, Justice Kagan, with respect to the Naomi Klein declaration, what it says on page 338A is, some of my sources will decline to share information with me if they believe that their communications are being monitored. That's a fair point, General. What if it said something different? What if she said — what if there were even an affidavit from the source saying, I have stopped talking with this journalist because of the FAA and because of my fear that my communications will be intercepted? I think you'd still have the problem of speculation there. And if I could, Justice Breyer, go to your proposed solution. I don't think it's a solution. I think it's a mechanism for people who think they may be under surveillance, foreign terrorists who think they may be under surveillance, to find out whether they are or not. I just don't think that's a workable solution at all. Three broader points, if I may. First, the — in every case in which the Court has found standing, every one on which the Respondents rely, the government conduct either happened or was certain to happen. In Meese v. Keene, the films had been labeled as political propaganda. It wasn't a question about how authority to do so would be exercised. In Laid Law, the permanent issue and the pollution was in the water. There wasn't speculation about that. Monsanto, we already talked about. The government action was certain. That's true in every case. And Summers drew a distinction with those cases because in Summers, there was no example of a concrete application of the authority. Second, there — the fact that some of their clients may take steps that incur costs doesn't change the injury. It's still speculative. It's the kind of subjective chill that Laird said was not sufficient to establish standing. And I think if you take a step back, think about what they are asking you to do. They are asking you to invalidate a vitally important national security statute based not on a concrete application of it and not — No, General Verrilli, this is not about the merits of the statute. They might have no claim on the merits at all, and so there would be no question of invalidation. The question is only, can they make their argument to a court? But the whole point, Justice Kagan, the basic, most fundamental point about the case or controversy requirement and the injury-in-fact requirement that is embedded in it is to preserve the separation of powers. They are asking the Court to consider invalidating the statute based on an assumption either that there's dragnet surveillance or an assumption that their clients are going to be put under surveillance without a single fact to substantiate either of those assumptions. I submit to the Court that it would be — Ginsburg, and that's what makes this — if there could be a person in this category who would know, but the person will never know. You did mention minimization procedures as one safeguard against abuse. What are the minimum — what minimization standards are taken that will protect plaintiffs in this class? It's a little bit hard to talk about, Your Honor, because to the extent we're talking about the process of acquiring foreign intelligence, that's a very sensitive intelligence method. And to the extent minimization plays into that, it's not public information. But there are some steps that are publicly known, and they are, for example, that information acquired can be retained only for certain limited periods of time, that when reports are done on information that the names of U.S. persons or corporations are redacted, there are other restrictions on the ability to use the information. So there are steps of that nature. Scalia Are there restrictions on giving the information to other government agencies, in particular the Justice Department? Verrilli, again, Your Honor, there are procedures that govern those issues. They're not public procedures, but there are procedures that govern those issues, yes. But I do — I understand the points, Your Honor, but I do think that's why Congress established this alternative structure of accountability with the statutory protections, with the FISA court review, including review for conformity with the Fourth Amendment, with very robust reporting requirements, semiannual reporting requirements. I see my time has expired. Thank you. Roberts Thank you, counsel. Counsel, the case is submitted.